REPORTER'S RECORD
VOLUME 2 OF 3 VOLUMES
TRIAL COURT CAUSE NOS. 1321493, 1321487, & 1321486
COA NOS. 02-18-00061-CR, 02-18-00062-CR,
02-18-00063-CR

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
5/24/2018 6:40:43 AM
DEBRA SPISAK
Clerk

THE STATE OF TEXAS           )  IN THE DISTRICT COURT
                             )
vs.                          )  TARRANT COUNTY, TEXAS
                             )
MICHAEL HONGPATHOUM          )  371ST JUDICIAL DISTRICT

_____

**MOTION TO ADJUDICATE**

_____

On the 1st day of February, 2018, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Mollee Westfall, Judge Presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine.

Norma Rico
Certified Shorthand Reporter

**A P P E A R A N C E S**

MS. ALLYSON KUCERA
SBOT NO. 24081858
MS. HANNAH BELL
SBOT NO. 24068993
TARRANT COUNTY CRIMINAL DISTRICT ATTORNEY
401 W. Belknap
Fort Worth, Texas 76196
Telephone: (817) 814-1400
COUNSEL FOR THE STATE


MR. BLAKE BURNS
SBOT NO. 24066989
ATTORNEY AT LAW
115 N. Henderson St.
Telephone: (817) 870-1544
COUNSEL FOR THE DEFENSE

CHRONOLOGICAL INDEX
VOLUME 2 OF 3 VOLUMES
MOTION TO ADJUDICATE

FEBRUARY 1, 2018                                    PAGE    VOL.

Caption.....................................    1      2

Appearances.................................    2      2

Proceedings.................................    5      2

Motion to Adjudicate........................    5      2

Pleas of True...............................    9      2

Motion to Suppress..........................    5      2

| State's Witnesses | Direct | Cross | VD | Vol. |
| --- | --- | --- | --- | --- |
| Jason Macha | 12 | 42 | 38 | 2 |
| Bradley Cantu | 49 | -- | -- | 2 |
| Steven Graves | 64 | 75 | -- | 2 |
| Robert SanFilippo | 76 | 87 | -- | 2 |
| Mark Rath | 90 | -- | -- | 2 |
| Brian Lukens | 98 | 106 | -- | 2 |

State Rests.................................  107      2

Motion to Suppress Denied...................  108      2

Both sides Close............................  108      2

Closing Argument by Ms. Kucera..........  109      2

Court's Ruling..............................  109      2

Punishment Phase............................  110      2

State Resubmits Adjudication Evidence...  110      2

State Rests.................................  110      2

| Defense's Witness | Direct | Cross | Vol. |
| --- | --- | --- | --- |
| Susan Thorbrue | 111 | -- | 2 |

Defense Rests...............................  114      2

CHRONOLOGICAL INDEX (CONTINUED)

Both sides Close....................... 114   2

Closing Argument By Mr. Burns........... 114   2

Closing Argument by Ms. Kucera.......... 115   2

Court's Ruling......................... 116   2

Proceedings Concluded.................. 118   2

Court Reporter's Certificate........... 119   2

------------------------------------------------------------

ALPHABETICAL WITNESS INDEX

| State's Witnesses | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Bradley Cantu | 49 | -- | -- | 2 |
| Steven Graves | 64 | 75 | -- | 2 |
| Brian Lukens | 98 | 106 | -- | 2 |
| Jason Macha | 12 | 42 | 38 | 2 |
| Mark Rath | 90 | -- | -- | 2 |
| Robert San Filippo | 76 | 87 | -- | 2 |

| Defense Witness | Direct | Cross | VD | Vol. |
|---|---|---|---|---|
| Susan Thorbrue | 111 | -- | -- | 2 |

------------------------------------------------------------

EXHIBITS INDEX

| STATE'S NO. | DESCRIPTION | OFFD | ADMT | VOL. |
|---|---|---|---|---|
| SX-1 | Evading Arrest Map | 20 | 21 | 2 |
| SX-2 | BODY CAM DVD | 38,61 73 | 39,61 73 | 2 2 |
| SX-3 | BODY/DASH CAM DVD | 83 | 83 | 2 |
| SX-4 | BODY CAM DVD | 94 | 95 | 2 |
| SX-5 | DASH CAM DVD | 104 | 105 | 2 |

P R O C E E D I N G S

(Thursday, February 1, 2018;

9:47 a.m.)

(Open court, defendant present,

no jury)

THE COURT:  On the record.  Court calls Cause Numbers 1321493, 1321487, 1321486.  All styled the State of Texas versus Michael Hongpathoum.  Is that you, sir?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And we're here today on the State's first amended petition to proceed to adjudication in each of these three cases.

What says the State?

MS. KUCERA:  State's ready, Your Honor.

THE COURT:  What says the Defense?

MR. BURNS:  Defense is ready, Your Honor.  We do have a couple of preliminary matters before we start calling witnesses.

THE COURT:  Okay.  Go ahead.

MR. BURNS:  Your Honor, on the petition, Defense would object to paragraph two and paragraph five for the same reason, in that it alleges the defendant committed a new offense while

on probation and the language set out in those paragraphs is insufficient to allege an offense committed in the State of Texas.

THE COURT: In what respect?

MR. BURNS: It fails to allege that the defendant knew that the officer was trying to detain him, and I believe the case law does require that.

THE COURT: What says the State?

MS. KUCERA: Your Honor, this -- it's about notice. We'll be happy to prove that as an element. The petition alleges that he was evading in a vehicle, and that he was a peace officer attempting to lawfully arrest or detain the defendant. And I believe 19 adequate notice. I don't think that 19 specifically -- I think it's case law, but not specifically an element to have to allege in a petition.

THE COURT: Response?

MR. BURNS: Your Honor, the petition alleges he committed a new offense against the State of Texas and it fails to allege that.

THE COURT: I think 19 sufficient notice. I'm going to overrule your objection.

MR. BURNS: I guess, just -- so I can

it put on the record.

THE COURT:  It's on the record.

MR. BURNS:  If I could put my case law in.

THE COURT:  Okay.  Go ahead.

MR. BURNS:  V. Jackson versus State, 718 S.W. 2d 724, Texas Court of CCA.

THE COURT:  All right.

Mr. Hongpathoum, the Court's file in these three cases reflects the State's first amended petition to proceed to adjudication, which alleges certain violations of the terms and conditions of your probation.  Have you had a chance to go over the allegations contained in these petitions with your attorney?

MS. KUCERA:  Your Honor, I was going to make the Court aware the State plans to waive -- do you want me to make you aware of it now?

THE COURT:  Yes.

MS. KUCERA:  The State plans to waive paragraph one, paragraph four, paragraph six, and paragraph eight, and proceed on paragraphs two, three, five, and seven.

THE COURT:  Mr. Hongpathoum, have you had a chance to go over the allegations contained in

these petitions with your attorney?

THE DEFENDANT: I'm looking over them right now.

THE COURT: Have you all been over them before this moment?

MR. BURNS: Me or him? Either one?

THE COURT: Yes.

MR. BURNS: Okay. Your Honor, we've been over the allegations. This is the first time he's probably seen it in print.

THE COURT: Okay.

MR. BURNS: But we've gone over what's alleged.

THE COURT: Mr. Hongpathoum, if you would rise, please, sir? This petition alleges that you appeared in this court on these three cases on August 7th, 2013, and pled guilty to the offenses of theft of a firearm; delivery of controlled substance of one gram or more but less than four grams, namely, methamphetamine; and forgery by possession of a forged writing, to wit, money; and were at that time placed on deferred adjudication/probation in each of these cases -- or seven years in the forgery and delivery, and a five-year deferred adjudication/probation in the theft of a firearm.

Is that true or not true?

THE DEFENDANT: True.

THE COURT: Paragraph two of each of these petitions alleges that you were ordered to commit no offense against the laws of this state or any other state of the United States, and that in violation of this condition you, on or about the 22nd day of September, 2017, in the County of Tarrant and the State of Texas did then and there intentionally flee using a vehicle from J. Macha knowing J. Macha was a peace officer who was attempting to lawfully arrest or detain you.

Do you understand what paragraph two alleges against you?

THE DEFENDANT: Yes.

THE COURT: To that allegation you may plead true or not true. What is your plea?

THE DEFENDANT: Not true.

THE COURT: I couldn't hear what you said.

THE DEFENDANT: Not true.

THE COURT: Paragraph three alleges that you were to commit no offense against the laws of this state or any other state of the United States, and that in violation of this condition you,

on or about the 22nd day of September, 2017, in the County of Tarrant and State of Texas, did intentionally or knowingly carry, on or about your person, a handgun, and you were in a motor vehicle or watercraft owned by you or under your control, and you were engaged in criminal activity other than a Class C misdemeanor that was a violation of the law or ordinance regulating traffic for boating. Do you understand what paragraph three alleges against you? Do you understand what paragraph three alleges?

THE DEFENDANT: Yes.

THE COURT: To that allegation you may plead true or not true. What is your plea?

THE DEFENDANT: Not true.

THE COURT: Paragraph five alleges you were ordered to commit no offense against the laws of this state or any other state of the United States, and that in violation of this condition you, on or about the 11th day of December, 2017, in the County of Tarrant in the State of Texas did then and there intentionally flee using a vehicle from R. San Filippo knowing R. San Filippo was a peace officer who was attempting to lawfully arrest or detain you.

THE DEFENDANT: Yes. Yes, ma'am.

THE COURT: To that allegation you may plead true or not true. What is your plea?

THE DEFENDANT: Not true.

THE COURT: Paragraph seven alleges you were to commit no offense against the laws of this state or any other state of the United States, and that in violation of this condition you, on or about the 11th day of December, 2017, in the County of Tarrant and State of Texas did intentionally or knowingly carry, on or about your person, a handgun, and that you were in a motor vehicle or watercraft owned by you or under your control and were engaged in criminal activity other than a Class C misdemeanor that was a violation of the law or ordinance regulating traffic or boating. Do you understand what paragraph seven alleges against you?

THE DEFENDANT: True -- I mean, yes.

THE COURT: To that allegation you may plead true or not true. What is your plea?

THE DEFENDANT: Not true.

THE COURT: You may have a seat, sir.

State may proceed.

MS. KUCERA: Thank you, Your Honor. At this time the State would call Officer Jason --

MR. BURNS: Your Honor, we had a Motion to Suppress on file.

THE COURT: Okay. We'll run that with this.

MS. KUCERA: Your Honor, at this time the State would call Jason Macha.

THE COURT: Raise your right hand.

(Witness sworn)

THE WITNESS: I do.

JASON MACHA, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. KUCERA

Q    Officer Macha, can you state and spell your full name for the court reporter.

A    Jason Macha, M-a-c-h-a.

Q    All right. And, Officer Macha, how are you currently employed?

A    Through the City of Fort Worth.

Q    And how long have you been with the City of Fort Worth?

A    About four years.

Q    And in what capacity are you employed with them right now?

A    Police officer.

Q    And what unit are you assigned to?

A    Central Division Patrol.

Q    And were you in Central Division Patrol when you -- on September 22nd, 2017?

A    Yes, I was.

Q    And, Officer, the Judge has heard multiple police officers testify.  Did you have to go through the same type of training and experience that other Fort Worth police officers have had to go through in order to be employed with Fort Worth?

A    Yes.

Q    And did you successfully complete that training?

A    Yes, I did.

Q    Were you trained in the procedures on, particularly, how to conduct a high speed police chase?

A    Yes.

Q    All right.  So on September 22nd, 2017, were you involved in a high speed police chase?

A    Yes, I was.

MR. BURNS:  Your Honor, at this time I would object for the reasons stated earlier that this would be outside the scope of what's alleged in the petition.

THE COURT:  Overruled.

MR. BURNS:  May I have a running objection so that I don't have to keep getting up?

THE COURT:  You may.

MS. KUCERA:  Thank you, Your Honor.

Q    (BY MS. KUCERA)  Officer Macha, on September 22nd, 2017, where were you when this initially started?

A    I was on the corner of Sylvania and Northeast 28th Street.

Q    And what is -- what location or establishment is on that corner?

A    There's an active game room.

Q    And were you sitting outside of that game room, watching it?

A    Yes, ma'am.

Q    And why?

A    Known illegal drug activity.

Q    Is it common for you on patrol to sit outside of one?

A    Yes.

Q    And so what did you observe when you were sitting outside of this particular gaming establishment?

A    I observed a male outside on his cellphone

at the time, kind of acting very suspicious, kind of paranoid, looking over at me and the other officer that was there in our patrol cars acting very nervous, kind of don't know what to do, flailing his arms up in the air, kind of pacing back and forth, you know, kind of acting erratic, very nervous.

Q    And it caught your -- you noticed this behavior at the time?

A    Yes.

Q    And you believed it to be suspicious?

A    Yes.

Q    And so what did -- what did you do next?

A    We continued to observe the -- the individual for approximately about five minutes or so.

Q    Okay.  And what did this individual then do?

A    Eventually, got in his vehicle and proceeded to leave the establishment.

Q    And what happened when he left the establishment?

A    Proceeded to leave the establishment.  He didn't stop at a sidewalk there that's -- goes in front of the business and proceeded eastbound on Northeast 28th Street at a high rate of speed.

Q   And did you then follow the vehicle?

A   I tried to catch up to him, but, by the time I got out to Northeast 28th Street, he was almost to -- making a turn onto Chandler West.

Q   Okay.  And so did you follow him after he turned?

A   Yes, I did.

Q   And did you observe additional traffic offenses?

A   Yes, I did.

Q   What did you observe?

A   I observed -- again, when he turned onto -- turned onto Hollis.  And when I got behind him on Hollis and he got on to Hollis and North Riverside, he again didn't stop on Hollis and North Riverside.

Q   Was there a stop sign there?

A   It was a stop sign or a traffic stoplight. I can't remember which, exactly.

Q   Did you observe him run that stop sign or traffic light?

A   Yes, ma'am.

Q   Okay.  And so did you continue with your pursuit?

A   That's when I initiated my overheads and

sirens.

Q    Okay.  And what happened when you initiated your sirens and lights?

A    He -- that's when he hit the gas and proceeded at even a higher rate of speed.

Q    Okay.  Your vehicle that you're driving in, what does it look like?

A    It was a Ford Explorer, black and white, had Fort Worth Police on it, red and blue lights, white lights.

Q    Is it very obvious that it's a police-issued vehicle?

A    Yes.

Q    And it has red and blue lights and sirens typically equipped on a patrol vehicle?

A    Yes.

Q    And you initiated those lights within the sight of the defendant; is that correct?

A    Yes.

Q    And obviously aware that you are making a traffic stop on this vehicle?

A    Yes.

Q    Any doubt in your mind that he should have been aware of that?

A    No.

Q    And he took off at a high rate of speed; is that correct?

A    Yes.

Q    All right.  So if you can, can you walk the Judge through the process of this chase from where it started -- you described you're on Riverside at this point, and where you proceed to go throughout the metroplex.

A    Is it okay if I look at my report?

Q    Yes.

A    Okay.

Q    Well, actually, Officer, let me ask you this:  Did this high speed chase continue for multiple miles at this point?

A    Yes.

Q    How many miles in total do you remember calculating?

A    Approximately 90.

THE COURT:  Nine, zero?

THE WITNESS:  Nine, zero, yes.

Q    (BY MS. KUCERA)  And so, Officer Macha, as you are going to walk the Judge through these highways and roads that you took throughout this police chase, do you think it would be helpful for her if she were to be able to see it and follow

along with you as you're dictating which roads that you took?

A Yes.

MS. KUCERA: Your Honor, may I approach the witness?

THE COURT: You may.

Q (BY MS. KUCERA) Now, Officer, while you were following the defendant for quite a while, were there -- were you getting call-outs over the radio of what else was going on and what happened after you had to abandon your search -- or your chase?

A Yes.

Q And so I'm going to approach you with what's been marked as State's Exhibit No. 1. Do you recognize this?

A Yes, I do.

Q And based on the information that you gathered from the radio call-outs during the entire process of the evading, does this map fairly and accurately depict the entire police chase as a whole?

A Yes, it does.

Q And is this -- can you tell the Judge essentially what this is?

A Yes.

Q    What is it?

A    This is pretty much the starting and the ending point of the pursuit.

Q    And can you follow along on this map the -- the pathway that you took when you were following the defendant?

A    Yes, I can.

Q    And I'm going to ask you again, do you think this would be helpful for the Judge in order to see the locations that you traveled on this evening?

A    Yes.

MS. KUCERA:  And, Your Honor, at this time I'm going to tender to defense counsel State's Exhibit No. 1, and then ask that it be admitted and permission to publish.

(State's Exhibit 1 offered)

MR. BURNS:  We just object for the reasons stated earlier that it contains allegations outside the petition.

THE COURT:  What specific allegation do you think it contains that's outside the petition?

MR. BURNS:  The evading.  We object. It is not sufficiently alleged in the petition.

THE COURT: And remind me what is your objection to the evading?

MR. BURNS: That the petition fails to allege that he knew this was a police officer.

THE COURT: Well, it says knowing he was a peace officer.

MR. BURNS: Correct, but it doesn't say that he knew he was trying to lawfully arrest or detain him.

THE COURT: Who was attempting to lawfully arrest or detain him?

MR. BURNS: It says that he was trying to, but it doesn't further allege that the defendant knew that.

THE COURT: Oh. Okay. I mean, you have a running objection, so...

MR. BURNS: Yes, Your Honor, that would be my only objection to this.

THE COURT: All right. That's overruled. State's 1 is admitted.

(State's Exhibit 1 admitted)

MS. KUCERA: Thank you, Your Honor. May I have permission to publish it to the Court?

THE COURT: Yes.

MS. KUCERA: I've printed it on the

Maverick as well if you want to --

THE COURT: Yes.

MS. KUCERA: -- view that. And I will trace along with Officer Macha as he's describing it.

THE COURT: Can you turn it slightly this way? Is it possible? Okay. That's good.

Q (BY MS. KUCERA) All right. Officer Macha, you described earlier -- and I'm going to point -- all right. Officer Macha, you described that you started at 2800 --

THE COURT: That's it right there. What you just flashed is green.

Q (BY MS. KUCERA) So, Officer, you described that you started at Northeast 28th Street, and you proceeded south on Riverside. And before I cut you off, you were describing the next roadway that this -- the vehicle that you were following went -- can you -- before you do that, can you tell the Judge what type of vehicle you were following?

A It was a Toyota FR-S.

Q Okay. What color was it?

A It was black.

Q And can you describe anything else specific about the vehicle?

A    Not in particular, no.  I mean, just two door.

Q    Okay.  All right.  And so you were driving on Riverside, and what is the next roadway that the vehicle enters?

A    121.

Q    Okay.  And 121 heading west?

A    Heading west, he took 121 westbound to I-35.

Q    Okay.  Northbound?

A    Northbound to I-35 to 820, took 820 eastbound.  We took that until it went to 820 southbound.

Q    Okay.

A    We then took 820 southbound to I-20.

THE COURT:  Let me ask you.  We're tracing a really long route.  What did you see?  Were you -- was the car in your sight the whole time?

THE WITNESS:  Yes, ma'am.

THE COURT:  And how fast was it going?

THE WITNESS:  I topped out at 131 miles an hour.

THE COURT:  Just to keep up with this

car?

THE WITNESS: Yes.

THE COURT: Did you ever -- you never were able to gain on the car?

THE WITNESS: Every time we came up to any kind of small turn or curve in the road, the defendant would always slow down, and I could always catch up, right up to it. Or any kind of car that it would come up to, it would always slow down and I could catch up to it. It never got more than -- the most it got ahead of me was probably a quarter of a mile, but, it was always in my sight. At times he would black out, turn off all of his lights, but I was still able to visually see it.

THE COURT: Did you have lights and sirens on the whole time?

THE WITNESS: The whole time.

Q (BY MS. KUCERA) Officer Macha, I think I asked you this earlier, what time of night was this?

A It was approximately 1, 1:30 in the morning.

Q Now, I know that it's late in the evening or early in the morning. Were -- was there still traffic that you were driving in and out of?

A Yes.

Q    Was this vehicle driving dangerously?

A    Yes.

Q    Was he putting all of the vehicles on the road that night at risk?

A    Yes.

Q    At great risk, in fact?

A    Yes.

Q    And you yourself as well?

A    Correct.

Q    All right.  So, Officer, you mentioned that you were on 820 southbound, and then you head east on I-20; is that correct?

A    Correct.

Q    And that's -- we're heading towards Arlington?

A    Yes.

Q    All right.  And then what happens after you're eastbound on I-20?

A    Hang on one second.  Let me make sure I get the correct route here.  We then went northbound on Highway 161.  From there we went eastbound on Highway 635.

Q    All right.  So, officer, I-20 to northbound on 161 is -- I just -- I glanced, is approximately 40 miles north, and then you go, you

said east on 635; is that correct?

A   Correct.

Q   And then you go north again on I-35 East?

A   Yes.

Q   And then what is the next roadway that you take?

A   That was -- at that point he swerved very quickly on that Highway 161.

Q   Okay.  So he goes back onto 161, or the President George Bush Turnpike?

A   Yes.

Q   When you say he swerved very quickly, were you able to follow him at that point?

A   No.  That -- at that point -- at that point he faked like he was going to go to the left, and at this last minute he swerved over to the right.  I went over to go to the left, the initial way he was going to go.  I couldn't make it over to the right.  I called out immediately over to the radio -- over the radio that he went to the right and there was another vehicle, K-9 unit, behind me and he was able to go the same way that he went.

Q   How many other officers were involved?

A   Immediately behind me there was a Fort Worth K-9 unit, and there was a -- I do believe it

was Irving K-9 Tahoe unit.

THE COURT: Irving?

THE WITNESS: Yes.

THE COURT: Any particular reason why they were involved?

THE WITNESS: Because we were going through their jurisdiction. It was either Irving or Grand Prairie, one of the two.

THE COURT: All right.

THE WITNESS: But we had gone through so many -- I think seven different counties -- or cities.

THE COURT: So people would come in and then dropped out?

THE WITNESS: Yes.

THE COURT: When their city limits hit?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: Yeah, actually, not Irving. I think it was Grand Prairie K-9 that stayed with us. So...

Q (BY MS. KUCERA) So at this point you -- let me back up. You -- he takes -- we're back up here at the George Bush Turnpike. He's able to --

you're coming from I-35.  You are not able to exit in time, but he is.  How close did you come to hitting the guardrail on that exit?

A    About that far.

Q    All right.  So how far is that?

A    Probably about a foot doing about 120.

Q    All right.  So, Officer Macha, at that point another officer takes over as the lead vehicle, in other words, in the chase; is that correct?

A    Correct.

Q    And you reverse -- just tell the Judge what happens.

A    So the Fort Worth K-9 passed me.  The Grand Prairie K-9 passed me.  I back up about 50 feet, try to get back into the pursuit.  That's when he goes back up to -- I think it was, Josey is where they make a U-turn.

Q    So the U-turn at Josey Lane, and he gets -- enters back onto 161 --

A    161, yeah.

Q    -- George Bush Turnpike.  Okay.

A    Yeah.  And that was the closest I made it back to him.  I ended up -- at one point the Grand Prairie unit gets caught behind some traffic.  I was

able to swerve around all that traffic and pass them. That's when I ran out of gas, shortly thereafter.

Q So, Officer, you're back on 161, the George Bush Turnpike --

A Correct.

Q -- heading here, and you run out of gas at approximately --

A Belt Line, I think it was.

Q -- Belt Line and 161?

A Yes.

Q Okay. So you're, again, kept up with what's going on with the search?

A Yes, ma'am. I'm constantly listening to the radio. The Grand Prairie officer, again, passes me. That's when he gets on 183.

Q So he goes east -- I'm sorry, westbound on 183 --

A Westbound on 183 up to Inter -- or International Parkway, which goes right through the middle of DFW airport, crashes through a gate at the airport.

THE COURT: Who crashed through the gate?

THE WITNESS: The defendant.

THE COURT: Okay.

A     K-9 officer was right behind him. The gate closes. There was another officer there waiting for the gate to open. At the north end of the gate going westbound on 114, the K-9 officer ran out of gas so he had to terminate the pursuit.

Q     (BY MS. KUCERA) And so is it fair to say at this point is when your officers have run out of gas and your pursuit is terminated; is that correct?

A     Correct.

Q     Okay. So again, you're still listening on the radio, and are you filling up your car with gas at this point?

A     At that point, there was actually a, like, a Irving Sheriff's officer that came and gave me, like, two gallons of gas, enough for me to make it to the airport to get me gas.

Q     Okay. And so what's going on, and are -- I guess, can you tell the officer -- or, I'm sorry, tell the Judge what else is going on at this time. You've lost the pursuit. You haven't found him. What are the other officers doing?

A     There was an off-duty officer who has access to the LPR system, which is our license plate reader system, and he was reading -- he was going

through the database with the -- running the license plate and seeing where that license plate had been.

MR. BURNS: Objection. Denial to confrontation as to what the other officer was doing and seeing.

MS. KUCERA: 19 just talking -- it's his state of mind or his understanding of what's going on.

THE COURT: Overruled as to that.

Q    (BY MS. KUCERA) You can continue.

A    The officer is running the license plate in the database, seeing where that license plate had been, if it had ever been hit in the city in the LPR system.

THE COURT: Where did you get the license plate information? Where did it come from?

THE WITNESS: It comes from tow trucks.

THE COURT: No, no. I sort of understand that. But who got the license plate off of the car?

THE WITNESS: I got it.

THE COURT: And at what point?

THE WITNESS: I got it off of the car when I initially got behind it. So we had that

initially from when I first got behind the vehicle.

THE COURT: All right.

A So, at that time, when the pursuit was initially over, when he was running, when he was running license plate in the database, it was hitting up on the east side of Fort Worth around the Meadowbrook area. Within about twelve minutes of time, officers called out that they spotted the vehicle at 820 and Meadowbrook. So from the north side of the airport, from 114 in the north side of the airport down there at the blue section, there (indicating) it was located at 12 minutes later. So even though the pursuit was over, he was still traveling at a high rate of speed, approximately.

Q (BY MS. KUCERA) And your best guess is he's getting from north of the airport to I-30 and I-20 in twelve minutes?

A Yes.

Q Traffic traveling incredibly quickly from your understanding?

A Correct.

Q And so I know this wasn't -- you weren't involved in this particular car, but you were made aware via the radio that they relocated the defendant and were continuing to follow that same

vehicle?

A    Correct.

Q    Is that correct?

A    Yes.

Q    Okay.  And so they -- your understanding is -- or can you tell the Judge of what your understanding is of how this pursuit ends?

A    Minor thing is they followed the vehicle here for -- this little pursuit here was approximately for about another ten to twelve more miles into some residential areas here.  They backtracked a little bit being a little couple of U-turns.  It finally ended up where it went down East 1st Avenue where he finally ran out of gas at the 4200 block of East 1st Avenue.  He then got out of the vehicle and started running on foot in a northwesterly direction.

THE COURT:  How do you know it was the same car?

THE WITNESS:  It matched the vehicle -- the vehicle description matched -- the vehicle description matched what the officers seen.  And one of the officers knew -- saw the plate when they saw it.

Q    (BY MS. KUCERA)  And so, Officer, after

the pursuit eventually terminates with the defendant running out of gas and you said he gets out of his vehicle and runs on foot, is he eventually apprehended?

A Yes, he is.

Q And so did you eventually arrive at that scene?

A About ten to fifteen minutes or so after.

Q And did you observe the car on that scene?

A Yes.

Q Was that the exact same car that you had been pursuing for several miles?

A Yes.

Q Any doubt in your mind it was the same vehicle?

A No doubt.

Q Do you -- you testified earlier that you observed the driver outside pacing around the gaming (sic), and you knew before he got in his vehicle?

A Yes.

Q Do you recognize that person in the courtroom today?

A Yes, I do.

Q And do you -- could you point out an article of clothing that he is wearing?

A    He is wearing a black shirt.

Q    Does he have glasses on, or not?

A    Glasses, yes.

MS. KUCERA:  Your Honor, may the record reflect this witness has correctly identified the defendant.

THE COURT:  The record will so reflect.

MS. KUCERA:  Thank you, Your Honor.

Q    (BY MS. KUCERA)  Officer Macha, after you arrived on scene, did you partake in any search or anything of the vehicle?

A    Yes, I searched the vehicle.

Q    And what did you locate inside the vehicle?

A    I located a gun when I ran it on through the PICA system, that it was stolen out of Midland, Texas.

Q    And where was the gun located in the vehicle, if you remember?

A    It was located in a black bag they got inside an Xbox bag.

Q    Inside the vehicle?

A    Yes.

Q    And can you tell the Court what the basis

for your search of the vehicle was?

A    It was incident to arrest.

Q    And had this vehicle been involved in an offense, and, in fact, a high speed pursuit throughout almost the entire metroplex?

A    Yes, it was.

Q    Is it fair to say that this defendant has been engaged in criminal activity while in possession of this weapon?

A    Yes.

Q    Is it a Toyota -- I think you described it as -- what kind of vehicle was it, do you remember?

A    Toyota, FR-S.

Q    Is that a motor vehicle?

A    Yes.

Q    Now, Officer Macha, the patrol vehicle that you were operating at the time, was it equipped with a dash camera?

A    Yes.

Q    Was that dash camera capable of recording the events accurately that evening?

A    Yes, it was.

Q    Have you had a chance to review your dash camera prior to coming to testify today?

A    Yes, I have.

Q    And did you review that in my office prior to your testimony?

A    Yes, I did.

Q    And when you reviewed it, did that dash camera fairly and accurately depict the events as they happened that night?

A    Yes.

Q    Does that include the speed of the vehicle, the other vehicles on the road, the dangerous driving patterns and behaviors?

A    Yes.

Q    Were there any alterations or deletions or anything to that dash camera?

A    No.

MS. KUCERA:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q    (BY MS. KUCERA)  I'm going to hand you what's been marked as State's Exhibit No. 2.  Do you recognize that?

A    Yes, I do.

Q    And do you recognize your initials on that DVD?

A    Yes, I do.

Q    And is that -- does that DVD contain your

dash camera that we just described?

A    Yes.

Q    And I'm going to ask you to make sure that dash camera doesn't contain any additions or deletions and is a fair and accurate depiction of the events that took place that night?

A    Yes, it is.

MS. KUCERA:  Your Honor, I'm going to hand State's Exhibit 2 to defense attorney and ask that it be admitted.  Your Honor, I will say this: The DVD does contain multiple dash cameras, and I'm only conditionally admitting Officer Macha's dash cam.  The other officers will be here to testify to theirs as well.

(State's Exhibit 2 offered)

MR. BURNS:  Can I have a couple of quick questions on voir dire, Your Honor?

THE COURT:  Yes.

VOIR DIRE EXAMINATION

BY MR. BURNS:

Q    Officer Macha, you reviewed this tape -- the video she intends to play right now?

A    Yes.

Q    Is it just the dash cam?  In other words, is the search also on there or is it just on the

car?

A    We're just talking about the dash cam, correct?

MR. BURNS:  And, Your Honor, I just object for the same reason as the last exhibit, that it contains allegations outside the petition.

THE COURT:  Overruled.  State's 2 is admitted.

(State's Exhibit 2 admitted)

MS. KUCERA:  Thank you, Your Honor. Permission to publish to the Court?

THE COURT:  Granted.

(State's Exhibit 2 published in

open court)

Q    (BY MS. KUCERA)  Now, Officer Macha, is this you leaving the gaming facility?

A    Yes.

Q    Can you see the defendant's vehicle?

A    That's what just turned right now.

Q    So, Officer, I know 19 difficult for you to see on the video, but you can see the glimpses of the taillights ahead of you.  Were you able to visually -- maintain a visual on this vehicle like you testified to earlier?

A    Yes.

Q    Now, Officer, you turned your lights on and he's approximately less than a hundred yards in front of you at that point?

A    Yes.

Q    And does he appear to be getting closer to you or farther away?

A    Further away.

Q    Officer, you testified -- you see the vehicle take quite a jump there.  What happened when your vehicle went over that bump?

A    My computer come out of its stand.  It was when we went over Belknap.

Q    So now you're entering 121; is that correct?

A    Yes.

Q    And are you going north on I-35 on the entrance ramp?

A    Correct.

Q    You mentioned earlier to the Judge that when you were driving on the streets and he had to take curves is when you were able to catch up with him.  After this, does this defendant stay mostly on freeways at this point?

A    Yes.

Q    Why do you think that is?

A    Trying to get away.

Q    Now, Officer Macha, on this video can you see that there's other traffic on the road?

A    Yes.

Q    And in your review of the dash camera, are there times when you can observe the defendant weaving in and out of traffic?

A    Yes.

Q    In a dangerous manner?

A    Yes.

Q    Now, Officer Macha, the video is -- we're four minutes and 22 seconds into the video.  And this video lasts for 47 minutes and 15 seconds.  Do you remember approximately what time you run out of gas?

A    About -- probably about 44 minutes into it.

Q    So, in other words, this entire pursuit throughout -- I mean, you said 90 miles earlier is 45 minutes long?

A    Correct.  I go for about 70 miles before I run out of gas and then K-9 goes for about ten miles before he runs out and then ten miles for about those other units.

Q    All right.

MS. KUCERA: I'm pausing the video at 5:19. Your Honor, should you wish to watch the entire video by all means, but -- Your Honor, at this time I pass the witness.

MR. BURNS: Thank you, Your Honor. May I approach the video?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. BURNS:

Q Officer, I don't know if you can see this, but is that the game room you were referencing --

A Yes.

Q -- where you spotted him? Now, where would the sidewalk be that he failed to stop at? Would it be this way or that way (indicating)?

A The game room is on the other side of the street.

Q So the game room is over here (indicating)?

A No, right where the bright lights are.

Q Right here?

A Correct.

Q Okay. So the sidewalk would be here or here?

A Sidewalk is going to be over there on the

other side of the street.

THE COURT: So you're across the street?

THE WITNESS: I'm across the street from the game room.

THE COURT: Can you see the sidewalk that you're talking about in this video?

THE WITNESS: It's not that clear on the video.

Q (BY MR. BURNS) We don't see him leaving. So this would be a better view of it, correct?

A Correct. So it's going to --

THE COURT: I'm not sure -- the red won't show.

THE WITNESS: May I approach the TV?

THE COURT: Yes, you may. And the green one is apparently out of battery.

MS. BELL: It doesn't show up either very well, Judge.

A The sidewalk runs right up along here (indicating). So it goes that way, and then continues on up along over here (indicating).

Q (BY MR. BURNS) I think I asked this, but we don't see him exiting on the video, correct?

A Correct.

THE COURT: Had he already exited then by the time you got to this point?

THE WITNESS: Yes.

Q (BY MR. BURNS) And would it be fair to say it's hard to see there's a sidewalk there on the video at least?

A Yes.

THE COURT: Were you trying to detain him at this point or was it later or did you turn your lights on right there?

THE WITNESS: No. Because when I got to the street by this point, he was already so far down Northeast 28th Street, he probably wasn't even knowing I was coming after him. So I was trying to get up closer to him so that he would know I was trying to pull him over.

THE COURT: Did you have your lights on at that point?

THE WITNESS: Not right now, no, because like I said, he was so far ahead of me, I wanted to make sure that he knew that I was trying to pull him over because if I turned them on now, you know, he might not know that I was trying to pull him over.

Q But -- so you're saying -- just so I

understand, at this point you are trying to pull him over, you're just not trying to put your lights on because you don't think he would see that far away; is that fair to say?

A   He might not know that I'm trying to pull him over.

Q   Right.  But you were -- that was your goal going toward him, was to pull him over at this point, correct?

A   Correct.

Q   And this may not be a real fair question, but if you need to review the videos, I know there was a bunch, so by all means, let me know if you need to review it.  But do you recall in the search video, you were describing to another officer basically this part of the chase and you mentioned you saw him at the game room, and then all of a sudden he was gone, you recall saying that?

A   I don't recall.

Q   And you said, So I'm going to go after that black car?  I mean, I would kind of match what you were saying here, that right now it's your intention to pull him over, correct?

A   Correct.

Q   Now, you also were the -- were you the

only officer that searched the vehicle in this case?

A    No.  There was another officer there that helped searched.

Q    Were you the primary searching officer?

A    There was two of us searching.

Q    Did you guys have a warrant to search the vehicle?

A    No, we did not.

Q    Now, the gun in this case was found in an Xbox bag; is that correct?

A    Yes.

Q    And you mentioned that was incident to arrest, correct?

A    Correct.

Q    Now, the relation to the Xbox bag, where was Mr. Hongpathoum when he was arrested?

A    He was in the back of a patrol car.

Q    Well, where was the actual arrest made in comparison to the Xbox bag?  Was it a hundred yards? Two hundred yards?

A    A hundred to two hundred yards away.

Q    And he was handcuffed immediately, correct?

A    Correct.

Q    There was no way he had access to that

bag, correct, at the time he was taken down and arrested?

A    Correct.

Q    Okay.  Now, you mentioned earlier as well that every time Mr. Hongpathoum got near traffic he slowed down; is that correct?

A    Uh-huh.

Q    And if there was a particularly sharp curve, he slowed down as well; is that correct?

A    Correct.

Q    Was he doing anything to use his car offensively, such as sideswiping somebody or ramming them off the road?

A    No, he didn't hit nobody.

Q    And he didn't even particularly hit that close, did he?

A    No.  He got close to people, but he didn't hit anybody.

Q    Well, he wasn't trying to hit anybody, correct, as far as you could tell?

A    He didn't hit anybody.  Whether he was trying to hit anybody or not, he didn't hit anybody.

Q    We're just going to go back to my original question, I guess, which nothing that you saw lead you to believe that he was using the car offensively

in this chase?

A     He didn't hit anybody.

Q     He didn't swerve at anybody that threatened to hit them?

A     You could have said he could have swerved at people, yes.

Q     You recall on the video where he swerved at a car, not around a car, but --

A     He got really close to some cars.

Q     He got really close or he swerved at that offensively?  I'm just asking.  I'm not trying to put words in your mouth.

A     Could have swerved at him, could have swerved around them.

Q     Could have?

A     When you're doing 130 miles an hour.

Q     And that's what I'm getting at.  If -- when you mentioned he's driving dangerously, you're talking about the speed, right?

A     Yeah.

Q     Primarily the speed?

A     Correct.

          MR. BURNS:  May I have one moment, Your Honor?

          THE COURT:  You may.

MR. BURNS: I pass the witness, Your Honor.

MS. KUCERA: No further questions for this witness, Your Honor. May he be excused?

MR. BURNS: Subject to recall, Your Honor.

THE COURT: You may step down and you're excused. You're subject to recall, which means you need to be reachable.

THE WITNESS: Okay.

MS. KUCERA: Your Honor, at this time the state would call Officer Bradley Cantu.

THE COURT: Raise your right hand.

(Witness sworn)

THE WITNESS: I do.

THE COURT: Have a seat, sir.

BRADLEY CANTU,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. KUCERA:

Q   Detective, can you state and spell your name for the court reporter.

A   Yes, 19 Detective Bradley Cantu. B-r-a-d-l-e-y, C-a-n-t-u.

Q   Now, Detective, can you tell the Judge how

you're employed.

A    I'm a detective with the Fort Worth Police Department.

Q    And how long have you been with the Fort Worth Police Department?

A    It'll be nine years this month.

Q    And when were you promoted to detective?

A    The last week of November.

Q    And what capacity were you working prior to being a detective?

A    As a patrol officer.

Q    And were you a patrol officer in September -- on September 22nd, 2017?

A    Yes, I was.

Q    Now, the Judge has heard multiple police officers testify.  Did you have to go through the requisite training and experience in order to become a Fort Worth Police Officer?

A    Yes, I did.

Q    Did that include the protocol and procedure on the high speed chase?

A    Yes.

Q    Were you involved in a high speed chase on September 22nd?

A    Yes.

Q   Can you tell the Judge sort of how you became involved in that?

A   So the pursuit, it started on the other side of town, and it went out of Fort Worth.  So since we are --

MR. BURNS:  Your Honor, may I renew my objection to being outside of the scope of the petition?

THE COURT:  Okay.  You have a running objection.

MR. BURNS:  Thank you.

A   Since it went outside of our city, since we weren't initially involved in the pursuit, we're not allowed to leave the city to try to engage the pursuit, catch up to it.  So I was working East Division that night and officers had -- were -- had pursued him outside of the city.  When they were coming back, I guess, Officer Macha, they had reinitiated the pursuit and they were coming back into Fort Worth.  So I was at Brentwood Stair and 820 and Officer Graves had just left the QT that's located there, and he had -- he saw the vehicle and started pursuing the vehicle.  So -- I was actually training another officer at the time.  And we got in our vehicles and tried to catch up to Officer

Graves. And once we hit Meadowbrook going westbound, we could see Officer Graves pretty far length ahead of us in pursuit with his lights on. And as we're trying to catch up, Officer Graves ends up losing the vehicle momentarily. So we just engage our lights, and we're now crossing over Oakland Boulevard on Meadowbrook continuing going westbound. And as we're going westbound, we see a two-door vehicle -- two-door black vehicle going eastbound with 19 headlights off. And the description we had gotten at that point was a two-door black vehicle. That's what me and my rookie knew at that time. So we turned around and we turned on our lights and hit our siren. And as we're trying to catch up to the car, the car just takes off from us at a very high rate of speed.

Q    (BY MS. KUCERA)  Officer --

MS. KUCERA:  Your Honor, may I approach the Maverick?

THE COURT:  You may.

Q    (BY MS. KUCERA)  Officer Cantu, Officer Macha testified earlier that this map is a fair and accurate depiction of the search. And I had an opportunity to show it to you this morning in my office. And do you agree with Officer Macha that it

is a fair and accurate depiction of the pursuit as a whole?

A    Yes.

Q    All right.  And so you were describing for the Judge -- and I'm going to point the screen that you were parked at the QT right at 820 and I-30; is that correct?

A    Yeah.  It's going to be Brentwood Stair and 820.

Q    I'm sorry, Brentwood Stair and 820.  And so you and Officer Graves are together at that time?

A    No.  Officer Graves was in another vehicle.  I was training another officer, and he was driving.  So we were in two separate patrol cars at that time.

Q    All right.  And had you had some information that the defendant or the suspect car at that point was located somewhere in that area previous to this occasion?

A    Yeah.  We had been notified -- and it was kind of normal, kind of protocol, whenever a pursuit leaves our city, especially in our side of town, if you're not involved, to kind of hang out at the entry points back in the city, like the freeways leading back in the city, because a lot of times the

vehicle will re-enter the city, so -- that's what we were doing. And a lot of the vehicles that were involved in the pursuit had ran out of gas, so that's why we were at the gas station, initially, so we would make sure that if the pursuit did get started again that we would have gas. So that's why we're sitting there. And we were notified to kind of stay in the area and then Officer Macha was pursuing the car. I believe it was down 820, but they were coming back into our city. So we know that the vehicle was coming back into our city.

Q All right. And so the pursuit had essentially ended up around the airport and you believed that it was possible that the suspect vehicle could re-enter the city?

A Yes.

Q And so you and Officer Graves were stationed in that area?

A Yes.

Q All right. And so you testified earlier that Officer Graves is the first one to spot the vehicle which matched the description?

A Yes.

Q And so he begins following that vehicle. And then you said, eventually loses sight of it,

correct?

A    Yes.

Q    So you told the Judge earlier that you and your Officer Magado (phonetic)?

A    Magado (phonetic), yes.

Q    Are trying -- in the process of trying to catch up to Officer Graves and the pursuit when you see the vehicle pass you?

A    Yes.

Q    Going the opposite direction?

A    Yeah.  It was going -- we were going westbound, kind of to go into the neighborhood that Officer Graves had lost the vehicle in, and this vehicle was passing us going eastbound.

Q    And you said it matched the color, the description -- and the description of the vehicle that had, to your knowledge, been involved in this entire pursuit?

A    Yes, it did.

Q    All right.  And so once you see the vehicle pass you, what do you do?

A    So once we see the vehicle pass us, it had 19 headlights off.  And, I mean, obviously it matched the description we're given and it was obviously suspicious that the headlights were off.

It was approximately 2:00 o'clock in the morning. So we make a U-turn on Meadowbrook and start heading eastbound. Officer Magado initiates our red and blue lights and we start trying to catch up to the car to reinitiate the pursuit, and, I mean, as we turned our lights on, the car just takes off from us.

Q    Did that give you further confirmation that you were following the right vehicle?

A    Yes.  So it went through the light at Meadowbrook and Oakland, and we just -- we tried our best to try to catch up to it, but it was pulling away from us the entire time.  And so Officer Graves, he was -- he happened to be in front of us on Oakland, and he got behind the vehicle, so he was closer at that point than we were.

Q    So I want to make sure I understand so that the Judge understands.  So essentially Officer Graves picks the vehicle back up, follows it down Meadowbrook, loses it, you guys take over, you pick it up, and then as soon as you pick it up and you're trying to catch back up with it, Officer Graves was able to get in front of you.  And so fair to say that once you picked it up back up, you never lost sight of the vehicle?

A    That's correct, yes.

Q    So were you involved in the -- I guess, tell the Judge what happens after you and Officer Graves were in pursuit?

A    So as we're going northbound on Oakland, Officer Graves, he had initially picked the vehicle up on Brentwood Stair, and when he got on Meadowbrook and Oakland that's when he ended up losing it.  So we then picked it up, Officer Graves -- we were called out on the radio that we were in pursuit in the vehicle again and Officer Graves just happened to be coming down south on Oakland Boulevard from Interstate 30, and the vehicle was driving northbound on Oakland.  So he made a U-turn in front of us since were so far away from the vehicle and we couldn't catch up, that he got in front of us and he was the first vehicle at that point who was in pursuit.

So we're behind Officer Graves.  We're following him trying to catch up to him.  We get up to Randol Mill.  We go westbound up on Randol Mill.  And as -- I can't recall which cross street we're passing, but as we're driving westbound on Randol Mill, the vehicle starts to slow down.  So Officer Graves starts to slow down, and we finally catch up

to Officer Graves and then the vehicle just stops. Once the vehicle stops, the driver jumps out of the driver's side of the car -- the driver's door -- and runs -- keeps running westbound down the street and then runs north into a field which -- where he was taken into custody.

Q   Now, Officer Cantu, were you involved in that foot pursuit?

A   Yes, I was.

Q   Did you observe the driver of the vehicle get out of the car and run?

A   Yes, I did.

Q   Do you see that driver in the courtroom?

A   Yes, I do.

Q   Officer Cantu, can you point to him and identify an article of clothing that he is wearing.

A   It's the gentleman sitting here with the black glasses on, black shirt.

MS. KUCERA:  Your Honor, may the record reflect that the witness has correctly identified the defendant.

THE COURT:  The record will so reflect.

MS. KUCERA:  Thank you, Your Honor.

Q   (BY MS. KUCERA)  Officer Cantu -- or, I'm

sorry, Detective, the vehicle that you were driving that evening, was it equipped with a dash camera?

A    Yes, it was.

Q    Was that dash camera capable of making an accurate recording of the events that took place?

A    Yes, it was.

Q    Have you had a chance to review that dash camera prior to testifying?

A    Yes, I did.

Q    Does that camera -- does the video fairly and accurately depict the events that took place?

A    Yes, it does.

Q    Does it depict to the point where you pick up the defendant's vehicle all the way until the apprehension?

A    Yes.  So when we turned on our overhead red and blue emergency lights, the camera goes back approximately 30 seconds, I believe, so it shows whenever Officer Magado hit the lights.  We had already -- I can't recall if we had already made the U-turn and we're heading eastbound following the vehicle, or if we were making the U-turn at the moment he hit his lights, but it doesn't have us coming westbound past Oakland where the vehicle is passing us, because at that time we didn't have our

camera on, we didn't have our emergency lights on, so the camera wasn't rolling at that point.

Q    But it eventually turns on at 30 seconds after you turn your lights --

A    Once it's turned on the camera is on, but it goes back 30 seconds.  So it captures us the moment we turn our overhead lights on going eastbound following the car and then going northbound on Oakland.

MS. KUCERA:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q    (BY MS. KUCERA)  Detective, I'm going to hand you what's been marked as State's Exhibit No. 2.  Do you recognize that?

A    Yes, I do.

Q    And are those your initials on State's Exhibit 2?

A    Yes, they are.

Q    And does State's Exhibit 2 contain the dash camera that we're specifically talking about?

A    Yes, it does.

Q    And, again, does that dash camera, that you've had a chance to review, fairly and accurately depict the events that you've just described for the

Judge?

A    Yes, it does.

MS. KUCERA:  Your Honor, at this time I would offer Detective Cantu's dash camera and tender to defense counsel and ask that it be admitted.

(State's Exhibit 2 offered)

MR. BURNS:  Objection to it being outside the scope of the petition, Your Honor.

THE COURT:  That's overruled and the dash camera on State's 2 is admitted.

(State's Exhibit 2 admitted)

MS. KUCERA:  Thank you, Your Honor. May I have permission to publish to the Court?

THE COURT:  That's granted.

(State's Exhibit 2 being published in open court)

Q    (BY MS. KUCERA)  Now, Detective, on the video you can see the lights on another police car. Is that Officer Graves's police lights that had --

A    Yes.  The one that's in front of us, that's Officer Graves.

Q    So he was able to get right behind the suspect vehicle?

A    Yes, he was.

Q    Detective, do you recall how fast you were going at this point?

A    I wasn't driving at the time, so I'm not -- I'm not sure how fast we were going. But we were going well over the speed limit. I know that. We were trying to catch up. Officer Magado, he was in his training phase of his field training. So he was a little hesitant to go too fast. So that's why we were having a little trouble at this point. He was kind of new. I don't know if he'd been involved in a pursuit at that time. But even with his driving, we weren't able to catch up to Officer Graves, and I was telling him the entire time to catch up to Officer Graves.

Q    Now, the video is at 2 minutes and 40 seconds. Is this approximately when the vehicle begins to run out of gas?

A    Yes.

Q    Officer, do you recall if the Air One helicopter was involved in this pursuit?

A    Yes, it was.

Q    Detective, do you remember if there was anyone else in the vehicle at the time?

A    Whenever -- which is about to happen -- the driver is going to get out and continue running

westbound.  Me and Officer Graves are going to pursue him on foot.  No one else got out of the car. I mean, to that point, Officer Magado ends up clearing the car for other people, but no one else got out of the car.

Q    No one else located in the vehicle?

A    No one else is located inside the vehicle.

Q    Now, at about 3 minutes and 40 seconds, can you observe you running past the suspect vehicle to apprehend the defendant on foot?

A    Yes.

Q    And this vehicle that you were following, that Officer Graves got in front of you, same vehicle that you were following?

A    Yes.

Q    Were you able to apprehend the driver of this vehicle?

A    Yes, we were.

MS. KUCERA:  Pass the witness.

MR. BURNS:  No questions for this witness, Your Honor.

THE COURT:  You may step down, Officer.

MS. KUCERA:  Your Honor, may this witness be excused?

MR. BURNS: Yes, Your Honor.

THE COURT: You may step down, and you are excused.

MS. KUCERA: At this time, Your Honor, the State would call Officer Steven Graves.

THE COURT: Raise your right hand.

(Witness sworn)

THE WITNESS: I do.

THE COURT: Have a seat sir.

STEVEN GRAVES, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. KUCERA:

Q    Officer Graves, can you state and spell your name for the court reporter.

A    Steven Graves, S-t-e-v-e-n, G-r-a-v-e-s.

Q    And, Officer, how are you currently employed?

A    Fort Worth Police Department, with the gang unit.

Q    How long have you been a police officer at Fort Worth?

A    Fort Worth, going on three and a half years.

Q    Were you a police officer somewhere else?

A    In Azle.

Q    In what capacity were you working for Fort Worth on September 22nd, 2017?

A    I was working patrol on the east side.

Q    And do you recall being involved in a high speed choice on the 22nd?

A    Yes, ma'am.

MR. BURNS:  Your Honor, I renew my objection of this witness as being outside the scope of the petition.

THE COURT:  Okay.  You have a running objection.

MS. KUCERA:  Thank you, Your Honor.

MR. BURNS:  And may I renew my objection to this witness as well?

THE COURT:  Running objection is for the whole thing throughout the hearing.

Q    (BY MS. KUCERA)  I'm sorry.  I forgot what I was asking you.  How -- were you involved in a high speed chase on September 22nd?

A    Yes, ma'am.

Q    And Officer Macha and Officer Graves both previously testified -- and do you recall, just generally speaking, the pursuit -- is it fair to say the pursuit had gone throughout a large portion of

the metroplex?

A    Yes, ma'am.

Q    And so were you stationed at the entrance back into Fort Worth in the hopes that the defendant's vehicle would show up?

A    Yes, ma'am.

Q    And so can you tell the Court where you were at the time?

A    I was at Brentwood Stair and 30.

Q    Okay.  Any particular reason you were at that location?

A    We had just got gas, just finished getting gas.

Q    All right.  And so did you happen to see the suspect vehicle?

A    Yes, ma'am.

Q    And can you tell the Judge what you saw?

A    As I was leaving the gas station going westbound on Brentwood Stair at the -- at East Loop 820, I saw a black two-door vehicle traveling at a high rate of speed, exit 30, and go westbound on Brentwood Stair Road.

Q    And did you recognize that vehicle as the one that was matching what had been called out to you over the radio?

A    Initially, no.

Q    And then what happened?

A    As I started trying to catch up to it, and -- he turned southbound on Oakhill.  And when I observed what the vehicle was, and I recognized it then.

Q    And how fast was he traveling at this point?

A    It was a very high rate of speed.

Q    So was it difficult for you to catch up to him?

A    Yes, ma'am.

Q    So did you then initiate a pursuit?

A    Yes, ma'am.

Q    And what happened?

A    He failed to yield the right of way.  And we continued southbound on Oakhill until we turned westbound on Meadowbrook.

Q    What happened when you turned westbound on Meadowbrook?

A    We continued at a very high rate of speed, and he slowly pulled away from me.  It got too far to where I couldn't see him anymore.  I couldn't see taillights.

Q    And so did you have your lights on at this

point?

A    Yes, ma'am, lights and sirens.

Q    And were you calling out over the radio your location?

A    Yes, ma'am.

Q    And once you couldn't see his taillights and you lost him, did you call that out over the radio?

A    Yes, ma'am.

Q    And were you made aware of the fact that Officer -- or, now Detective Cantu, was able to locate him on Meadowbrook in the opposite direction?

A    Yes, ma'am.  After I lost sight of him, I started heading back to the last point where I saw him.  And at that time Officer Cantu called out that the vehicle had passed by him.

Q    And what did you do when you learned of their location?

A    I was traveling southbound on Oakland when Officer Cantu saw him coming eastbound on Meadowbrook.  And so he called out that he had turned northbound on Oakland, which was coming my direction, so I made a U-turn in the middle of the road and waited at an intersection for the vehicle to come by.

Q    And did that vehicle pass you?

A    Yes, ma'am.

Q    Did that vehicle match the same vehicle that you had been following just previously?

A    Yes, ma'am.

Q    And did that same vehicle match the exact same description of the one that had been involved in this DFW metroplex pursuit?

A    Yes, ma'am.

Q    And so were you able to get behind the vehicle?

A    Yes, ma'am.

Q    And once you were able to get behind the vehicle, were you able to maintain a visual on that vehicle?

A    Yes, ma'am.

Q    So can you tell the Judge what happened after you began following the vehicle?

A    I followed the vehicle over I-30 and then went over to Randol Mill and went westbound.  Then I keep eyes on the taillights throughout until I could see.  And on Randol Mill I started catching more ground.  I started gaining ground because I noticed the vehicle had started slowing -- slowing down, at which we came to a stop.

Q   When you were following this vehicle, did you observe multiple traffic violations?

A   Yes, ma'am.

Q   Speeding?

A   Yes, ma'am.

Q   Running stop signs or not yielding to traffic devices or signals?

A   Yes, ma'am.

Q   Anything else?

A   I used a turn signal.

Q   Okay.  And so the vehicle starts slowing down.  What happens after the vehicle starts slowing down?

A   When it came to a stop, the driver exited the driver's seat and began running.

Q   What did you do?

A   I exited my patrol vehicle and began chasing him.

Q   And what did you observe when you chased him?  What happened?

A   I followed him into a field.  When there was officers behind me -- when he was tackled by another officer who was coming from the opposite direction.

Q   So was this -- the driver of the vehicle

taken into custody?

A     Yes, ma'am.

Q     Any doubt in your mind that the driver of that vehicle is the same person who was taken into custody and arrested?

A     No, ma'am.

Q     Do you see that driver in the court today?

A     Yes, ma'am.

Q     Will you point to him and identify an article of clothing he's wearing?

A     The gentleman with glasses wearing a green shirt.

MS. KUCERA:  Your Honor, may the record reflect the witness has correctly identified the defendant.

THE COURT:  The record will so reflect.

MS. KUCERA:  Thank you, Your Honor.

Q     (BY MS. KUCERA)  Officer, when you were operating your vehicle that night, was your vehicle equipped with a dash camera?

A     Yes, ma'am.

Q     And was that dash camera capable of making an accurate recording of the events that took place?

A     Yes, ma'am.

Q    And was it activated during this pursuit?

A    Yes, ma'am.

Q    Have you had a chance to review that dash cam prior to testifying this morning?

A    I have.

Q    And when you were able to review that, was the dash camera a fair and accurate depiction of the events that took place that night?

A    Yes, ma'am.

Q    And were there any additions or deletions made to that video?

A    No, ma'am.

MS. KUCERA:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q    (BY MS. KUCERA)  Officer, I'm going to hand you what has been marked as State's Exhibit 2. Do you recognize that?

A    I do.

Q    And do you see your initials on that?

A    Yes, ma'am.

Q    And is that this video that you watched of your dash camera, the same video we have been talking about that's been describing the same events that took place?

A     Yes, ma'am.

MS. KUCERA:  Your Honor, at this time I would offer Officer Graves's dash camera video, State's Exhibit -- that's listed on State's Exhibit No. 2.

(State's Exhibit 2 offered)

MR. BURNS:  Just object to being outside the scope of the petition, Your Honor.

THE COURT:  Overruled.  State's 2 dash cam video of Officer Graves is admitted.

(State's Exhibit 2 admitted)

MS. KUCERA:  Thank you, Your Honor. May I have permission to publish to the Court?

THE COURT:  That's granted.

MS. KUCERA:  Thank you, Your Honor.

Q     (BY MS. KUCERA)  Now, Officer Graves, can you describe what's going on in this video?

A     So this video is after I lost him the first initial time.

Q     And what road are you on?

A     We are on Interstate 30 traveling eastbound.  About this time Officer Cantu had said that he was -- the suspect had passed him traveling eastbound on Meadowbrook.  This is getting ready to be Oakland Hill -- I'm sorry, Oakland Boulevard

which he made a right turn, southbound on...

Q    And so you're heading back to that location to try to intercept the vehicle?

A    Yes, ma'am.

Q    So at 1 minute and 15 seconds you initiate a U-turn, and that vehicle you are currently getting behind is the suspect vehicle?

A    Yes, ma'am.

Q    How fast do you think that vehicle was going at the time?

A    Somewhere probably between 70 and 80.

Q    And is that at a residential neighborhood?

A    Yes, ma'am.

Q    And is that, in your opinion, extremely dangerous?

A    Yes, ma'am.

Q    Officer, what street is this that you're turning left on?

A    19 Randol Mill but maybe East First Street right there.  It splits there on Oakland.

Q    And those taillights that you can see on the video, are those the taillights of the suspect vehicle?

A    Yes, ma'am.

Q    Now, there's a light that's shining on

the -- the vehicle, is that the Air One helicopter?

A    Yes, ma'am.

Q    Now, Officer, at 4 minutes and 9 seconds on your video, what are you observing?

A    The driver exited the vehicle and began running on foot.

Q    Are you also chasing him on foot?

A    Yes, ma'am.

Q    And you described it earlier that he runs north here into a field.  And are you able to apprehend him?

A    Yes, ma'am.

Q    Any doubt in your mind that with your lights flashing and the type of vehicle that you were driving, which is a patrol vehicle, that this defendant knew you were a police officer attempting to lawfully arrest or detain him?

A    No, ma'am.

MS. KUCERA:  I'll pass the witness.

CROSS-EXAMINATION

BY MR. BURNS:

Q    After Mr. Hongpathoum was arrested in the field, he was taken in the back of the police car; is that correct?

A    I would assume so.

MR. BURNS:  Pass the witness, Your Honor.

MS. KUCERA:  I have no further questions for this witness.  May he be excused?

MR. BURNS:  Yes, Your Honor.

THE COURT:  You may step down, sir, and you're excused.

MS. BELL:  The State would call Officer SanFilippo.

MR. BURNS:  Could we take a short break, Your Honor?

THE COURT:  Yes.

(Recess from 10:53 a.m. - 11:07 a.m.)

THE COURT:  Raise your right hand.

(Witness sworn)

THE WITNESS:  I do.

THE COURT:  Have a seat, sir.

ROBERT SANFILIPPO, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BELL:

Q   Good morning, Officer.  Would you please introduce yourself and spell your name for the court reporter.

A    I'm Officer Robert SanFilippo, S-a-n-F-i-l-i-p-p-o.

Q    Officer San Filippo, how are you currently employed?

A    I'm an officer with the Fort Worth PD.

Q    And what did you do before that?

A    I was a corrections officer for 12 years.

Q    Do you recall what you were doing December 11th of 2017?

A    Yes, ma'am.

Q    And what was that?  What were you doing that evening?

A    Routine patrol.

Q    And where were you doing your routine patrol?

A    In the area of Beach and Northeast 28th.

Q    And did you observe anything that caught your attention?

A    Yes.  I observed the suspect vehicle.

Q    And how did you know it was a suspect vehicle?

A    I was involved in a short pursuit where the suspect vehicle evaded about one week prior.

Q    And that week prior had y'all been able to catch that suspect vehicle?

A     No, ma'am, it was too fast.

Q     And what about that suspect vehicle did you see this night in question?

A     It was a small black two-door.  It had the license plate stuck up on the top left corner of the windshield.  It was very recognizable.

Q     What did you do next?

A     I parked in the parking lot and I waited for the driver to come out.

Q     And then what happened?

A     Driver came out, got into the vehicle, and I pulled up behind the car, initiated an investigatory stop to try and ID the driver.

Q     Was that successful?

A     No.  The driver decided to turn the car on and back up into my police car and take off.

MR. BURNS:  Your Honor, I object least for now just the backing into the police car being outside the scope of the petition.

THE COURT:  Overruled.

Q     (BY MS. BELL)  After you backed into your police car and started driving away, what did you do?

A     I engaged in a pursuit.

Q     Now, Officer, how long was this pursuit,

roughly?

MR. BURNS: Your Honor, I object again to the evading outside the scope, and may we have a running objection on that?

THE COURT: 19 overruled, and you may have a running objection.

A    In excess of 30 minutes.

Q    (BY MS. BELL)  And how many ground units were called out?

A    Twenty-eight ground units.

Q    And was anybody else called out on this particular evading?

A    Our helicopter.

Q    And why was the helicopter called out?

A    Because we couldn't keep up with the car. It was too fast.

Q    So you had 28 ground units and a helicopter.  Did y'all maintain a visual on this suspect vehicle during the whole evading?

A    We did have enough units to keep a visual eye on him, yes.

THE COURT: How is this car so much faster than your police cars?

THE WITNESS: It's a brand new Toyota FR-S.  It has a top speed of 146 miles per hour.

Our squad typically won't go over 130.

Q    (BY MS. BELL)  So when you started the pursuit, where were you at?

A    It was at North Beach and Northeast 28th.

Q    And that's in Tarrant County?

A    It is in Tarrant County, yes.

Q    And that vehicle that you described, what was it again?

A    A 1216 Toyota FR-S.

Q    And that's considered a motor vehicle?

A    Yes.

Q    Now, Officer, did you -- were you part of the pursuit from the beginning to the end?

A    No, about a few minutes into it I struck a curb and bent a wheel, so I had to drop out early.

Q    And why did you drop out early?  What was the bent wheel keeping you from doing?

A    I couldn't keep up.

Q    Did you run the -- how did you identify the defendant?

A    He was involved in a pursuit about a month and a half prior to my pursuit, and I knew his face.

THE COURT:  Were you involved in that pursuit.

THE WITNESS:  No, ma'am.

THE COURT: How did you know his face from that pursuit then?

THE WITNESS: My teammate chased him. We share information.

THE COURT: So you saw his face through your teammate?

THE WITNESS: No, his booking photo.

Q    (BY MS. BELL) And although you had to drop out of the pursuit early, did you state -- through radio, did you know where the pursuit was heading, and what was going on throughout the whole course of this event?

A    Yes. Yes, I did.

Q    Did you -- when did you end up getting the suspect's name? Did you remember when about you realized who it was and you ran his name?

A    Probably a few minutes into the chase.

Q    And you told me -- based on your offense report, did you look him up and did you confirm any warrants or anything of this defendant?

A    I had an idea that he had a warrant already, but I had not already confirmed it.

Q    And during this course of these events, did you end up doing that?

A    Yes. I did run him, and he showed seven

warrants.

Q    Officer San Filippo, did you have a body cam that night?

A    Yes, I did.

Q    And do you know how to properly activate it?

A    Yes, I do.

Q    And did you have video from this incident in question?

A    I do.

Q    And this morning did you watch it on a disk?

A    Yes, I did review it.

Q    And does it fairly and accurately represent the proceedings of that night?

A    Yes, it does.

            MS. BELL:  Your Honor, may I approach the witness?

            THE COURT:  You may.

Q    (BY MS. BELL)  Officer, I'm handing you what's been marked as State's Exhibit 3.  Do you recognize it?

A    Yes, ma'am, I do.

Q    And how do you recognize it?

A    It's initialed and dated by me.

MS. BELL: Your Honor, I'm going to tender to Defense.

(State's Exhibit 3 offered)

MR. BURNS: We just object that the acts depicted are outside the scope of the petition.

THE COURT: Overruled. State's 3 is admitted. Does it have multiple files on it like State's 2?

(State's Exhibit 3 admitted)

MS. BELL: No, Your Honor. This one only has SanFilippo's body cam.

THE COURT: And were all of the files on State's 2 offered and admitted? Are there any files that didn't come in through a witness?

MS. KUCERA: Yes, Your Honor, there are files on State's 2 that were not published to the Court or admitted through a witness. I can articulate those at the conclusion.

THE COURT: Okay.

MS. BELL: Permission to publish?

THE COURT: That's granted.

This is your body cam?

THE WITNESS: That's cool. Yes.

Q    (BY MS. BELL) At this point, what's happened?

A     He's gotten into the car, and I'm pulling up to make contact.

Q     Now, why did you pull your gun out?

A     I'm sorry.  What was the question?

Q     So right here you pulled your gun out. Why did you pull your gun out?

A     He stuck his hand in his right pocket.  I sort of heard a movement.  I thought he might have had a gun out.

Q     And did you have any prior information that might have led you to believe that he had a gun?

A     Yes.  The last time he was captured, he had a loaded pistol.

Q     Okay.  Thank you.  So when you say he's "blacking out", what does that mean?

A     That means he turns all his lights off.

Q     And what type of area were y'all driving through?

A     That's a residential area.

Q     And would you say you were driving fast or slow?

A     Extremely fast.

Q     And was he stopping at the stop signs?

A     No, ma'am.  He didn't even slow down at

the stop signs.

Q    How many stop signs would you say, during the course of you chasing him, that he ran?

A    Roughly ten.

Q    And how fast would you estimate that you were going right about now through this residential area?

A    In excess of 80 miles an hour.

Q    So you had just hit a curb and you knew you were about to be disabled?

A    Yes, ma'am.

Q    What did you do?

A    Called out for additional units.

Q    Now, are you able to see the defendant's vehicle at this time?

A    Yes, ma'am.

Q    Now, Officer, when did you end your pursuit?

A    I ended my pursuit when my vehicle wouldn't go any further.

Q    And was there someone there to follow him at that time?

A    Yes, there was.

MS. BELL:  And, Your Honor, 19 on video, but in the interest of time, I was going to

go ahead and pause it at 6 minutes and 30 seconds unless you'd like to see the rest?

THE COURT: No. Go ahead and pause it.

Q (BY MS. BELL) Officer San Filippo, when you initially approached him, is there any doubt in your mind that he knew you were a police officer?

A There was no doubt.

Q And were you attempting to detain him?

A Yes, I was.

Q And so, in your opinion, was he knowingly and intentionally fleeing?

A Yes, he was.

Q And when you knocked on his window, were you able to get a good look at him?

A Yes.

Q And do you see that person in the courtroom today?

A Yes, ma'am.

Q And would you please identify him by an article of clothing?

A He's wearing a green shirt right there.

MS. BELL: Your Honor, may the record reflect that the witness has identified the defendant.

THE COURT: The record will so reflect.

MS. BELL: Thank you, Your Honor.

State will pass the witness.

CROSS-EXAMINATION

BY MR. BURNS:

Q Good morning, Officer Filippo?

A Good morning, sir.

Q You mentioned on your direct examination that you saw a booking photo of the defendant, and that's how you recognized him?

A That's correct.

Q Now, how did you get that photo, was it just attached to the car and y'all looked up the owner of the car?

A No, sir. 19 part of our MS database.

Q But how did you get a photo? You saw a car in a pursuit, correct? And that car got away?

A Correct.

Q Right?

A Yes.

Q Okay. So how did you get from there to the booking photo of Mr. Hongpathoum?

A From the initial pursuit from my partner.

THE COURT: Are we talking about two

or three pursuits?

THE WITNESS:  Three total.

THE COURT:  So we've got a pursuit in September, a pursuit that was a little bit before this.  How long before this?  December?

THE WITNESS:  About a week.

THE COURT:  So the week before this, and then this is the third pursuit?

THE WITNESS:  Yes.

THE COURT:  You got the booking photo from which pursuit?

THE WITNESS:  The first one.

THE COURT:  Okay.  And what caused you to associate that booking photo with this car that you saw in the convenience store?

THE WITNESS:  It was the same car.

THE COURT:  How did you know that?

THE WITNESS:  Because of the license plate up in the top left corner of the windshield.

THE COURT:  Okay.  It was the location of the license plate.  Did you have the license plate number?

THE WITNESS:  I did.

THE COURT:  From which pursuit?

THE WITNESS:  Both.

THE COURT: From pursuit number one and pursuit number two?

THE WITNESS: Yes.

THE COURT: All right. And so you saw the license plate number and the distinctive license plate, and you had an idea of who you were looking for from September book-in?

THE WITNESS: Yes. Yeah.

THE COURT: Okay.

MR. BURNS: Thank you, Your Honor.

Q (BY MR. BURNS) Is it safe to say -- or fair to say from that -- in the pursuit a week before you never laid eyes on the driver?

A I did not personally, no.

Q Now, in reference to the video, is it fair to say that at no point that we saw on the video was he free to just drive off and leave? Is that fair to say?

A He was not free to leave.

Q And that's from the very beginning of the video, correct?

A Yes.

Q And at that point the behavior you had observed from him was exiting the store and getting in the car; is that fair to say?

A    That's correct.

MR. BURNS:  Pass this witness, Your Honor.

MS. BELL:  No further questions.  May this witness be excused?

MR. BURNS:  Subject to recall, Your Honor.

THE COURT:  You are excused.  You're subject to recall.  That means you need to be reachable.

MS. BELL:  The State would call Officer Rath.

THE COURT:  Raise your right hand.

(Witness sworn)

THE WITNESS:  I do.

THE COURT:  Have a seat sir.

MARK RATH,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BELL:

Q    Good morning, Officer Rath, would you please spell your name for the court reporter.

A    Last name Rath, R-a-t-h.

Q    Thank you.  And how are you currently employed?

A    The aviation unit -- air support unit, Fort Worth PD.

Q    And what does that entail?

A    We give air support -- helicopter air support to most patrol -- to anybody in the city that needs it, not just the police department.

Q    And how long have you been employed in that position?

A    Eight years.

Q    And, Officer, did you receive training to become a peace officer?

A    Yes.

Q    A police officer?

A    Yes.

Q    And the Judge has heard before, but you received all the training that police officers have to be -- pardon me -- you went through the police academy?

A    Yes, ma'am.

Q    And how long have you been a police officer?

A    Fort Worth, 22 years.

Q    Officer Rath, the night in question is December 11th of 2017.  Were you dispatched at that time?

A    I don't remember if we were actually dispatched or if we were just up and heard it, but we got on the call, yes.

Q    And so "up and heard it", could you explain to me what that means?

A    We try to do some patrol if we have a helicopter available and we're not down with the weather or something.  We just try to just get out and do some flying and we'll monitor the radio and if we hear something we'll try to head that way if we're already in the air and try to get to it before 19 over.

Q    So in the helicopter, is there some kind of camera?

A    Yes, ma'am.

Q    And do you know how to operate that?

A    I do.

Q    And what are the capabilities of this camera?

A    19 the one that we have in the helicopter that we were in that night was our better one -- we got two of them -- but it's got a good zoom.  FLIR, forward looking infrared, you can see in total dark, so there's almost nothing you can't see with it as long as its not been sitting out in the heat.

Q    And you said it has a good zoom.  What does that mean?

A    A lot more zoom than most cameras that I know of.  You can pick out a car several miles away and usually be able to tell two-door, four-door, maybe a make.

Q    And how fast would you say that the helicopter -- how fast can a helicopter go?

A    The one that we got, depending on when, but on a calm night, if you push it, it will run about 125 miles an hour.

Q    So would you say 19 fair to say that 19 unusual for a vehicle to outrun the helicopter?

A    It is.

Q    And did you review your footage of this incident?

A    Yes, ma'am.

Q    And was there a time when y'all were losing -- the car was escaping the helicopter?

A    There was.

MR. BURNS:  Your Honor, I object again to being outside the scope for this witness.

THE COURT:  Overruled.

Q    (BY MS. BELL)  Officer Rath, did you have a chance to review your footage with me this

morning?

A     Yes, ma'am.

Q     And was it on the CD?

A     Yes, ma'am.

Q     Does it fairly and accurately depict this offense?

A     It does.

MS. BELL:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q     (BY MS. BELL)  Officer Rath, I'm handing you what's been marked as State's Exhibit 4.  Do you recognize it?

A     I do.

Q     And how do you recognize it?

A     It's by Air 19, that's on it and my initials and ID number.

Q     Thank you.

MS. BELL:  Your Honor, I'm going to tender to defense and enter into evidence State's Exhibit 4.

(State's Exhibit 4 offered)

MR. BURNS:  I'm going to ask that -- that's the only video on here?

MS. BELL:  Yes.  That's the only

video on here.

MR. BURNS:  Just object to it being outside the scope of the petition, Your Honor.

THE COURT:  That's overruled. State's 4 is admitted.

(State's Exhibit 4 admitted)

MS. BELL:  Permission to publish, Judge?

THE COURT:  That's granted.

MR. BURNS:  Thank you.

Q    (BY MS. BURNS)  And, Officer Rath, how long would you estimate this vehicle to be?  How long would you estimate this pursuit to be?

A    Time wise?

Q    Yes.

A    It was about 30 minutes, maybe a little less.

Q    And throughout the video, because we reviewed it this morning, are there instances where there's traffic that they're having to weave in and out through?

A    Yes, ma'am, a little bit.

MS. BELL:  Now, Your Honor, in the interest of time, I was going to skip towards the end.

THE COURT: Proceed.

MS. BELL: Thank you, Judge.

THE COURT: And what time mark are we looking at?

MS. BELL: We started at 22 minutes and 15 seconds.

Q    (BY MS. BELL) And, Officer Rath, what had caused him to slow down?

A    From what I understand, he got his tires spiked by the stop sticks. They spiked his tires out on the freeway by the stop sticks or spike strips, whichever they were using.

Q    And so what we see right now is the defendant, we saw him exit his car and he's fleeing?

A    Yes, ma'am.

Q    So Air One had eyes on him pretty much from the beginning of this evading, all the way until he got out of his car, that had been spiked, and ran into this building here?

A    Yes, ma'am.

Q    I'm going to stop the video at 23 minutes and 5 seconds.

MS. BELL: State passes the witness.

MR. BURNS: No questions for this witness, Your Honor.

THE COURT: So you say the helicopter is on patrol in the air just ready to respond routinely.

THE WITNESS: When we can. We try to. That's what we like to do. We try to fly a couple of hours, two to four hours a shift, just flying around, so if something happens, monitoring all five channels. And if we hear something, we'll head that way whether at force or not and maybe we'll be able to get something on video or help out.

THE COURT: Anything further from either side based on the Court's questions?

MS. BELL: No, Judge.

MR. BURNS: No, Judge.

MS. BELL: May this witness be excused?

MR. BURNS: Yes, Your Honor.

THE COURT: You may step down. You're excused, sir.

MS. BELL: State will call Officer Lukens.

THE COURT: Raise your right hand.

(Witness sworn)

THE WITNESS: Yes, Your Honor.

THE COURT: Have a seat, sir.

BRIAN LUKENS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BELL:

Q    Good morning, Officer Lukens.  Would you please spell your name for the court reporter.

A    L-u-k-e-n-s.

Q    Officer Lukens, how are you currently employed?

A    I'm employed with the Fort Worth Police Department.

Q    And how long have you been with the Fort Worth Police Department?

A    Been hired for over a year, commissioned for nearly five months.

Q    When did you go through the police academy?

A    January 23rd of last year through September 15th.

Q    And do you recall what you were doing December 11th of 2017?

A    Yes, ma'am.

Q    What was that?

A    I was, before this incident happened, sitting down on 7th Street in the City of Fort

Worth.

Q   And, at that time, did you have an FTO?

A   Yes, I did, ma'am.

Q   And what were y'all doing sitting at 7th Street?

A   We were meeting with some other officers talking about what we were going to do the rest of the night.

Q   And what happened next?

A   We were sent a message over NBC that there was a chase going on in the central division and they want us west units --

MR. BURNS:  Your Honor, objection to being outside the scope of the petition of the evading.

THE COURT:  Overruled.

A   Sitting outside, we got a message out of NBC from dispatch stating that there was a chase in the central division that had been going on for, I believe, somewhere around 20 to 25 minutes and that they wanted some west units to try to get in position and set up spike strips.

Q   (BY MS. BELL)  And what are -- explain to me what spike strips are, like --

A   Spike strips are something that each --

most of the vehicles, if not all the vehicles, have in back of their patrol car that way you can get out on the side of the road and throw them across the road, and when a suspect vehicle drives by, they'll flatten any tires that drive over those strips.

Q    It reaches across multiple lanes of traffic?

A    It can reach across multiple lanes of traffic.

Q    And so y'all receive calls.  So did you and your FTO go out to try and place spike strips?

A    Yes, we did.

Q    Were y'all successful?

A    No.  We didn't get a chance to set out spike strips.

Q    And why was that?

A    Because by the time we were getting on 30, we were at 30 westbound to go set up spike strips. They had turned onto 30 eastbound off the 820 loop.

Q    Eventually, were officers successful in spiking the car?

A    I believe they did spike some tires on the car.

Q    And were other officers' cars spiked as well?

A    Yes, ma'am.

Q    So tell me when you and your FTO entered the pursuit?

A    We were going westbound on I-30 to try to meet them at the loop somewhere.  We got -- we were told that they had turned onto 30 eastbound, so we turned around at 30 eastbound at Altamere.  And Altamere is kind of -- you can't really see the highway too well during that time.  So that time they had passed us and got in front of us on 30 eastbound.  And once they told us that, we tried to catch up to him.

Q    Were y'all successful?

A    We eventually did catch up to him, yes.

Q    And then what happened?

A    As we caught up to him on the service road just off of Montgomery and 30, we observed the defendant running southbound from the officers with two officers chasing him.

Q    And what did you do?

A    We went off the service road in our patrol vehicle, and I chased him through -- a parallel of the defendant -- through an opened parking lot and then chased him into a parking garage where I cut him off.  He had ran on the passenger's side of my

patrol vehicle. Officer Hanberger (phonetic) is in the passenger's seat and tackled him. And then I came over and assisted Officer Hanberger (phonetic).

Q And in assisting him, would you say the defendant was compliant?

A The defendant was very resistant and not listening to verbal commands.

Q And during the course of y'all trying to arrest him, did something happen that caused you concern?

A Absolutely. I was on his torso and a central officer came up to help. And so the central officer took over his -- the defendant's right arm while he was laying on his back. I took over his left arm, controlling his left arm, I put it under my right leg. And that time they said something about a gun, and then he had a gun, so -- and he wouldn't get his hand out of his right front pocket.

Q So which was in his right front pocket?

A His right hand.

Q So it came to your attention that his hand was in a pocket where there was potentially a gun?

A Yes, ma'am.

Q What did you do in response to that?

A I had his left arm completely mobilized

with 220 pounds of my weight.  So I withdrew my service weapon from my holster and put it on his chest and told the victim, You have a gun on your chest.  Think about what you're doing.

Q    And did he become more compliant after that?

A    He did become more compliant.

Q    Officer Lukens, after y'all finished arresting him, was there in fact a gun in his pocket?

A    Yes, there was.

Q    And do you recall what kind of gun it was?

A    I recall it being a .32 caliber.

Q    And do you remember if it was loaded or unloaded?

A    It was loaded.

Q    Was it chambered or not?

A    It was chambered.

Q    So the defendant had a chambered pistol in his right pocket that his hand was on when y'all were attempting to arrest him?

A    Yes, ma'am.

Q    Officer Lukens, did we review dash cam footage from your unit as well as body cam footage?

A    Yes, ma'am.

Norma Rico
Certified Shorthand Reporter

Q    And would you say it fairly and accurately represents what we just talked about?

A    Yes, ma'am.

MS. BELL:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q    (BY MS. BELL)  Officer Lukens, this CD has two videos; is that correct?

A    Yes, ma'am.

Q    It has a dash cam and it has a body cam?

A    Yes, ma'am.

Q    And how do you recognize this CD?

A    I signed it and dated it.

MS. BELL:  Your Honor, the State would --

Q    (BY MS. BELL)  And it's marked as State's Exhibit 5?

A    Yes.

MS. BELL:  Your Honor, the State would tender State's Exhibit 5 to defense.

(State's Exhibit 5 offered)

MR. BURNS:  And for verification, it's two videos, correct?

MS. BELL:  Yes.

MR. BURNS:  Then I object to both the

videos containing things outside the scope of the petition.

THE COURT:  Overruled.  State's 5 is admitted.

(State's Exhibit 5 admitted)

MS. BELL:  Permission to publish, Judge?

THE COURT:  That's granted.

Q    (BY MS. BELL)  So, Officer Lukens, we're going to look at your dash cam first.

MS. BELL:  And, Your Honor, I'm going to move it up a few minutes to when they pursue the defendant, start it at 2:05.

(State's Exhibit 5 being published in open court)

Q    (BY MS. BELL)  Now, you actually have the defendant.  Can you see his vehicle right now or are y'all trying to get to where he's at?

A    We're trying to get to him.  I believe we're on University right now.  So 19 quite a ways off ahead.  We're turning westbound on I-30 and University right now.

Q    I'm going to fast forward to 8 minutes, roughly.  Is that the defendant that you can see?

A    That is the defendant, yes, ma'am.

Q    I stopped the video at 9 minutes and 40 seconds.  Now I'm going to play the dash cam footage.  What's happening right now?

A    We're trying to detain the defendant.

Q    So this kind of coincides right where we stopped the dash cam?

A    Yes, ma'am.

Q    So after you had a gun to his chest, you were able to detain him and cuff him?

A    Yes, ma'am.

MS. BELL:  Judge, unless you would like to see the rest, I'll just pause the video at 1 minute and 35 seconds.

State will pass the witness.

MR. BURNS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BURNS:

Q    Good morning, Officer Lukens.

A    Good morning, sir.

Q    Did you review all of the video related in this case, or just your video before the trial today -- or before the hearing?

A    I reviewed some of -- a couple of different videos.

Q    Now, prior to, I guess, recovery of the

weapon, he did tell you guys that he had a gun; is that correct?

A    I don't remember exactly how that happened, sir.

Q    Okay.  You don't recall another officer on another video maybe saying, Well, he told us he had a gun?

A    I don't recall that.  He may have.  I can't say yes or no.

MR. BURNS:  Pass the witness, Your Honor.

MS. BELL:  No further questions.  May this witness be excused?

MR. BURNS:  Yes, Your Honor.

THE COURT:  You may step down.

MS. KUCERA:  Your Honor, at this time the State would rest.

THE COURT:  Defense?

MR. BURNS:  Your Honor, as far as adjudication is concerned -- well, I guess I need to speak with him for a second.  Okay.  Sorry, Your Honor.  I just wanted to make sure my client knew of his rights as far as testifying goes, but we don't have anything to present as far as adjudication, other than renewing our Motion to

Suppress.  We do have two briefs.

THE COURT:  So do you rest as to the adjudication?

MR. BURNS:  As for the evidence we're going to present, yes, Your Honor.  We'd still like a ruling on the motion.

THE COURT:  Okay.  The motion's denied.  Do you close?

MS. KUCERA:  We close, Your Honor.

THE COURT:  Do you close?

MR. BURNS:  We close, Your Honor.

THE COURT:  Arguments?  This is not a unitary proceeding.  There's a punishment phase, if there is a punishment phase.

MS. KUCERA:  Understood, Your Honor.  We would waive opening and reserve the right to close.

MR. BURNS:  We rest and close, Your Honor.

THE COURT:  All right.  So you're not going to argue as to the allegations?

MR. BURNS:  As to the adjudication phase, I don't think we have any argument as to that.

MS. KUCERA:  Very briefly,

Your Honor. I believe that the State has more than met the burden that is required of them in a revocation hearing. We believe that we have proven the offenses that have been alleged in paragraphs two, three, five, and seven.

Your Honor, the Court has heard from six different witnesses in this case articulating the entirety of all of these offenses, and we believe the evidence is clear and unequivocal before this court. We ask that you would find those allegations to be true.

THE COURT: Mr. Hongpathoum, based on the testimony that's presented today the Court finds allegations two, three, five, and seven in each petition to be true, finds that you violated the terms and conditions of your probation, finds you guilty of the offense of delivery of a controlled substance one to four grams, namely, methamphetamine, forgery by possession of a forged writing, to wit, money, and theft of a firearm.

Anything further in the punishment phase?

MS. KUCERA: Nothing further from the State.

MR. BURNS: Your Honor, I have two

very brief witnesses. I'd like to ask the Court for about two minutes to talk to them.

THE COURT: Okay. That's fine.

Ready?

MR. BURNS: Yes, Your Honor.

THE COURT: Okay. Does the State have any evidence in punishment?

MS. KUCERA: Your Honor, the State would just reoffer everything that was offered in the adjudication phase, and we would rest.

MS. BELL: Judge, may our witnesses be excused?

MR. BURNS: Yes, Your Honor.

THE COURT: They're excused.

MR. BURNS: Thank you. Your Honor, we'd like to call Susan Thorbrue.

THE COURT: Raise your right hand.

(Witness sworn)

THE WITNESS: Yes, ma'am.

THE COURT: Have a seat, ma'am.

MR. BURNS: Thank you, Your Honor.

SUSAN THORBRUE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BURNS:

Q    Good morning, Ms. Thorbrue.

A    Good morning.

Q    Could you just introduce yourself to the Court and spell your name for the reporter, please.

A    My name is Susan Hongpathoum, S-u-s-a-n, H-o-n-g-p-a-t-h-o-u-m, Thorbrue, T-h-o-r-b-r-u-e.

Q    And what is your relation to the defendant?

A    I'm Michael Hongpathoum's older sister.

Q    And how long have you known Michael?

A    His entire life.

Q    And do y'all stay in pretty good touch?

A    Yes.

Q    During his probation period, has he had a job?

A    Yes.

Q    What was he doing?

A    He worked in a restaurant out in Carollton.  He worked for the -- one of our -- 19 a Thai restaurant.

Q    And was he taking care of business as far as his fees and everything for the court?

A    He was -- yes, he was -- as I know, he was

doing what he was supposed to be doing.

Q    And what happened with that job?

A    Well, basically, they were unfair with his -- basically, they unfairly fired him.

MS. KUCERA:  Your Honor, I'm going to object.  Calls for speculation.  She's not the employee.  How can she testify to what they were doing, the employers?

MR. BURNS:  I can ask it a different way, Your Honor.

THE COURT:  Okay.  Ask it a different way.

Q    (BY MR. BURNS)  Now, that job ended up falling through because of, we'll say a disagreement; is that correct?

A    He was wrongly let go.

Q    Now, how would you -- just in general, how would you describe Michael?

A    Michael is a big for nothing, like he's huge.  He's a big guy for nothing.  I protect him.

Q    And what do you mean by that?

A    A little, big sister.

Q    What do you mean by big for nothing?

A    Michael's not aggressive.  He's a soft, gentle, big guy.

Q   Do you think he would ever intentionally hurt anybody?

A   No.

Q   And you understand he's facing up to 20 years, you understand that?

A   Yes.

Q   And he's definitely -- well, he's not definitely, he's probably going to the penitentiary. You understand that?

A   Yes.

Q   What is it that you would like to ask the Court today?

A   Michael -- Michael does need to be incarcerated for what he's done but not for a long time, not for being aggressive, for anything like that.  He knows he's done wrong.

Q   Is he a good brother in your opinion?

A   Yes.

Q   Is he a good friend?

A   Yes.

Q   Does he try to take care of his family?

A   Yes.

Q   Like to see him home some day?

MR. BURNS:  Pass the witness, Your Honor.

MS. KUCERA: I have no questions of this witness.

THE COURT: You may step down, ma'am.

MR. BURNS: Your Honor, I'd like to call Phenam (phonetic) Hongpathoum to the stand, but I may need Ms. Thorbrue to translate.

THE COURT: She's not a certified translator and she's a witness in this case. And without a translator that's certified, I can't allow that.

MR. BURNS: Okay. We won't call her. It would be mostly cumulative.

THE COURT: Do you rest?

MR. BURNS: Yes, Your Honor, we rest.

MS. KUCERA: Rest and close, Your Honor.

THE COURT: Do you close?

MR. BURNS: We close, Your Honor.

THE COURT: Arguments?

MS. KUCERA: We waive open.

MR. BURNS: Your Honor, we'd just like to ask the Court to take into account that Mr. Hongpathoum is a young man. He's never been to the penitentiary before so 19 going to be a tough time on him, and he just wants to ask the Court that

he be given a sentence short enough that gives him a chance that shows he can learn his lesson, he can stay out of trouble. And he understands that he has to pay a debt. But he just wants to ask the Court that he has a sentence short enough to give him a chance to prove he can be a citizen, a law-abiding citizen.

MS. KUCERA: Briefly, Your Honor.

I think the Court has plenty of evidence before it that demonstrates that Mr. Hongpathoum's actions are extremely reckless. He has no regard for the safety of the community, and his actions, his driving that night, in the first evading, 90 miles throughout the metroplex, regardless of what questions the defense counsel asked, 19 honestly, Your Honor, if you'd like to go back and watch the dash cam, a mere miracle that an accident wasn't caused that night.

The speeds in which they were driving, the highways in which they were driving on are not unpopulated. The actions of this defendant are, like I said, in extreme disregard for the safety of the community, the safety of the officers who are pursuing him, even the safety of his own person. I do not think the community is safe with

him in it. It's not as if this was a one-time thing. You heard two separate accounts of an evading that occurred over multiple miles, multiple units. Both times Air One was called out.

Your Honor, this conduct is extremely reckless, extremely dangerous. He deserves absolutely no sympathy from this court. He has demonstrated nothing here today in his opportunity to do so, which should allow you to give him any sympathy. He had a gun in his pocket. And he is honestly lucky he was not killed. It is an incredibly dangerous conduct that he is participating in. And I think, Your Honor, you would be well within your right to sentence him to the maximum because that is absolutely what the State is asking for in this case based on all of the evidence that you have before you.

THE COURT: Defendant will rise.

Mr. Hongpahthoum, the Court has found you guilty of the offenses of delivery of a controlled substance one to four grams, namely methamphetamine, theft of firearm, forgery by possession of a forged writing, to wit, money.

Taking carefully into consideration all the testimony and evidence that's been presented

to the Court, the Court will set your sentence in these cases at 20 years confinement in the delivery of a controlled substance case; 10 years confinement in the forgery by possession of a forged writing, to wit, money; and, 2 years confinement in the state jail in the theft of firearm case.

It is the order, judgment, and decree of this court that you be remanded by the sheriff of Tarrant County to the director of the institutional division to serve your sentence as required by law. You have a right of appeal in these cases, which I'll ask your counsel to stay on and explain to you. If you cannot afford an attorney to prosecute your appeal, an attorney will be provided to you by the court. You have 30 days in which to file your notice of appeal. You will be given credit for all the time you've served in these cases. The sentences in these cases will run concurrently.

It's hard for me to understand what in the world you were thinking, if it was a game, if you just had a fast car and you like to run, or if you had something in the car you felt was so important to conceal from the police that you decided to run over and over from them. Also, your possession of a firearm while on felony probation,

a -- one firearm that's stolen and another in your pocket that you're reaching for while you're being arrested, and you are very, very lucky to be alive. I think that the police officers showed an admirable and perhaps even full hearty amount of restraint in not injuring you or shooting you outright when you're reaching for a loaded gun in your pocket. They gave you the gift of life, and I hope that you will make the most of it, and I hope that you will be ready to be a little bit more law-abiding when you come out from the other end of these sentences.

Sheriff, he's your prisoner.

(Off the record at 12:14 p.m.)

STATE OF TEXAS

COUNTY OF TARRANT

I, Norma Rico, Deputy Court Reporter in and for the 371st District Court of Tarrant, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND on this, the 21st day of May 2018.

*Norma L. Rico*

Norma Rico, Texas CSR 8579
Deputy Court Reporter
371st District Court
Tarrant County, Texas
PO Box 331883
Fort Worth, Texas 76163
Telephone: (682) 701-3739
Expiration: 12/31/2018